THE STATE ex rel. M. M. COTHREN *vs.* JOSEPH LEAN, Register of Deeds, Iowa County.

WRIT OF MANDAMUS.

Argued June 24, and July 8.]    [Decided June 27, and July 11, 1859.

*Constitutional Law—Practice—Mandamus—Elections— Voter—County Seat—Publication of Laws.*

In an action by mandamus, it is proper practice for the respondent to move to quash the alternative writ for defects in the application therefor.

Applications for the writ are *ex parte*, and need only show a probable cause to allow it to be issued; but such allowance is not conclusive on the sufficiency of the application, and may be tested by a motion to quash.

If an act providing for a vote on the removal of a county seat contains other qualification for voters, than is prescribed in the constitution, then the act is unconstitutional and void.

The case of *The State ex rel. Knowlton vs. Williams,* 5 Wis., 308, alluded to and approved.

It is competent for the legislature to prescribe questions to be propounded to voters, calculated to draw from them the proof of their qualifications to vote at an election, and require the voter to answer them before he can vote; but this does not add any new qualification to the voter.

The character of an act of the legislature whether it be a "general" law or not, so as to require publication under the constitution, is determined by the greater or less extent to which it affects the people, rather than by the extent of territory over which it operates; therefore a law operating in a single county, but affecting the rights of all the people therein, is a general law.

A law providing for the location of a county seat is a general law, and required to be published before it can go into effect, by the constitution, Art. VII., § 21.

A law which incorporates into its provisions penalties for illegal voting, and for counselling or advising it; and which may apply to people residing outside of the county in which the vote is to be taken, is clearly a general law.

It is a sufficient allegation in pleading that a law was not published, to state that the act was never published in accordance with the provisions of chapter 6, laws of 1858, "nor in any other manner known to the law."

A motion to quash an alternative writ is in the nature of a demurrer to the

writ, and on overruling the same, the respondent should have leave to answer.

The allegations of the petition for an alternative writ of mandamus which are incorporated into the writ, performs the office of a declaration, and the respondent must, by his return to the writ, negative these allegations, and show a right to refuse obedience to the writ, in view of its allegations.

A demurrer to a return to a mandamus tests the sufficiency of the return, and assumes all the allegations in the writ not denied nor confessed and avoided to be true.

A plea to a return to a mandamus traverses the return, when it has first answered the allegations of the writ; but it need not repeat them, in order to obtain their benefit.

A general law must be furnished to the state printer, "within one week after its passage," and he is "required to immediately publish the same in a newspaper printed at the seat of government." This act is not complied with, by a publication by the state printer several months after the passage of the law, and after the time for the publication of the law in the bound volume has expired; and such publication does not render the law effective.

If the public printer fails to comply with the statute, by an immediate publication of a general law, in a newspaper at Madison, he may still give them effect by publication at any time prior to the publication and issuing of the bound volumes of the. laws, or by publication therein; but not afterwards.

When the bound volumes of laws have been issued and distributed among the people, pursuant to law, they have the right to look to these volumes as containing all the laws by which they are to be governed, until the next session of the legislature.

The facts in this case are sufficiently stated in the opinions of the court.

. *M. M. Cothren,* for the relation.

*H. Orton & Hopkins,* for the respondent.

*By the Court,* PAINE, J.    This was an application for a writ of mandamus, to compel Joseph Lean, the register of deeds of Iowa county, to keep his office at Mineral Point. An alternative writ was issued at the last term, and on the return day counsel appeared on behalf of Lean, and moved

State ex rel. Cothren vs. Lean.

to quash the writ, for alleged defects in the petition on which it was granted. This motion was argued in the absence of the relator, but was not disposed of, and owing to the changes of the judges composing this court, a re-argument wa ordered.

At the present term the relator has filed a motion to strike from the files the motion to quash, and also another motion for a peremptory writ. These three motions were argued together, and will now be disposed of.

In support of the motion to strike off, it was urged that after an alternative writ of mandamus is once issued, the person to whom it is directed can only make return according to its mandate, and cannot be permitted to move to quash the writ, even for alleged defects in substance in the petition on which it was issued. But we are satisfied that as a matter of practice, in such cases, a motion to quash is entirely proper. Alternative writs are usually granted without much examination. The papers are read, and if it appears clearly that the petitioner is not entitled to the relief sought, the writ is refused. Otherwise it has been usual to allow it to issue, leaving the merits of the application to be determined when presented by those familiar with them, and when both sides should be represented. And this course is almost a necessity.

Applications for the writ are *ex parte*. The questions involved are frequently complicated, and the solutions difficult. And it would be impossible for the court to give them such examination, that the issuing of the writ should be held at all conclusive on the sufficiency of the application. And a motion to quash is a proper mode of testing that sufficiency. It performs the functions of a demurrer to a declaration, and we think, if a writ should be issued on an application defective in substance, the person to whom it was directed should have some method of raising that question, before being compel-
to answer. And the authorities cited by the counsel for

the respondent show that a motion to quash has been resorted to for that purpose, both in this country and in England. We think the practice proper, and the motion to strike off must therefore be denied.

And this brings us to the consideration of the motion to quash, upon its merits. The material facts alleged in the petition on which the writ was issued, are, that Mineral Point was the county seat of Iowa county, and had the necessary county buildings and offices; that on the 28th day of April, 1858, an act was passed by the legislature, submitting it to a vote of the electors of that county, at the general election in November following, to decide whether the county seat should be removed to Dodgeville, in that county, or not; that this law was not published by the state printer, and was never published in any manner known to the law; but that a pretended law, in reality never enacted, fixing the the time of voting on the county seat question in April, 1858, instead of in November, was published by the state printer in his newspaper, and in the bound volume of the laws printed for that year, as a law. That certain residents of Dodgeville executed bonds and trust deeds for the purpose of securing the erection of county buildings there, in case of removal; and issued handbills informing the people of that fact; and that this had a corrupting influence on the electors, inducing more to vote for a removal than the actual majority in favor of it; that the people of the county did vote on the question, at the November election, and that the majority was three hundred and fifty in favor of the removal to Dodgeville; and that subsequently the register of deeds had kept his office in Dodgeville.

It will be obvious therefore that the question, whether the county seat of Iowa county is at Mineral Point or Dodgeville, depends upon the validity of this election; and that this depends upon the operative effect of the law under which it was held.

State ex rel. Cothren vs. Lean.

The relator contends that it never was in force ; *first*, because unconstitutional and void. The ground of this objection is that the provisions of chapter 85 of the general laws of 1857, are incorporated into and made a part of this act, and that those provisions prescribe other and different qualifications for the voters of this election than those prescribed by the constitution for electors ; and that this case falls, therefore, within the decision of this court in the case of *The State ex rel. Knowlton vs. Williams*, 5 Wis., 308. If it is true that this act does prescribe such other qualifications, then the objection is good, and the law must be declared void. But we are satisfied that it contains no such provisions. The clauses relied on, at the argument, as having this effect, are the provisions of §§ 13 and 14, of chapter 85, of the laws of 1859, before alluded to.

Section 13 provides that when the vote of any person is challenged, the inspectors of election shall examine him under oath, and prescribes a series of questions adapted, in each instance, to the cause of challenge, and calculated to draw out from such person the truth as to whether such cause of challenge existed against him or not. But the grounds of challenge to which the sets of questions are adapted, imply only the qualifications required by the constitution; nothing further or different. This act, therefore, instead of prescribing any qualifications for electors different from those provided for in the constitution, contains only new provisions to enable the inspectors to ascertain whether the person offering to vote possessed the qualifications required by that instrument and certainly it is competent for the legislature to enact such. The necessity of preserving the purity of the ballot box, is too obvious for comment, and the danger of its invasion too familiar to need suggestion. While, therefore, it is incompetent for the legislature to add any new qualifications for an elector, it is clearly within its province to require any person

offering to vote, to furnish such proof as it deems requisite, that he is a qualified elector.

The questions prescribed by this act, are clearly of this character, designed only for that end; and we do not deem it necessary to allude further to the criticism to which they were subjected by counsel. It is true that § 14 provides that if any person challenged refused to answer, his vote should be rejected. But does that make the answering of the questions a new qualification for a voter? Certainly not. Under the law, as it before existed, any one whose vote was challenged had to take an oath that he possessed the qualifications required by the constitution. If he refused, his vote was rejected. But this did not make the taking of the oath a new qualification, so as to invalidate the law. It was rejected only because he failed to furnish the proof required by law, showing his right to vote.

The law as it then stood, was deemed ineffectual to prevent illegal voting, and the legislature adopted the act of 1857, as more searching in its provisions, and more difficult to evade. If the vote of any elector is rejected under it, it will not be because it makes any new qualification, but only because he refuses to furnish the proof it requires that he has the old. We think, therefore, that this objection cannot be sustained, and that there is nothing in the act in question repugnant to the constitution.

The only remaining reason urged why the law never was in force, is that it was not published. And whether publication is a condition precedent to its taking effect, depends on the question whether or not it is a general law, within the meaning of § 21, Art. VII., of the constitution.

That section is as follows: "The legislature shall provide "by law for the speedy publication of all statute laws, and "such judicial decisions made within the state as may be "deemed expedient. *And no general law shall be in force* "*until published.*"

This act itself provides that it shall be in force from and after its passage; and we think it would take effect accordingly, unless it comes within the prohibition of the constitution. Because, as that prohibition expressly includes only "General Laws," the rule that the expression of certain things excludes others not expressed, applies; and laws not "general," ought not to be held within its provisions.

Is this act, therefore, a general law? It is, undoubtedly, difficult to draw an accurate line between general laws, and those not general; or to establish a test that will be entirely satisfactory. One test urged was that laws which operate throughout the whole state, should only be deemed general, and that those which relate to, or operate directly only in particular localities or divisions of the state, should not be so deemed. This test is simple and easy of application; but we confess that it does not seem entirely satisfactory. It makes the mere extent of territory over which the law operates, determine its character as general or otherwise. While it seems clear that the very nature of the provision requiring the publication of general laws, indicates that the character of the law should be determined by the greater or less extent to which it affects the people, rather than by the extent of territory over which it operates. It might be suggested that the former test would depend on the latter, or that the law would affect the people, in proportion to the extent of territory over which it should operate.

But this certainly is not so. Because there are many laws relating only to particular trades or professions, or subjects, yet operating throughout the whole state, and affecting the people at large, only so far as they have dealings with those particular trades or professions, or be interested in those particular subjects. Yet these are classed, and we think properly, as general laws.

Now, there may be several hundred thousand, or even sev-

State ex rel. Cothren vs. Lean.

eral millions of people residing in a single county. It is clear, therefore, that a law operating in a single county, but affecting the rights and interests of all the people there, may be really of more general interest and importance than one operating throughout the whole state, but relating only to a particular class.

Laws of a purely private character are generally passed at the instigation of those interested; and it might, therefore, well be presumed that all such persons were aware of their provisions, and that no injury could accrue from allowing them to be in force before publication. But when they relate to, and affect the rights of such large numbers of the people, that this presumption is destroyed; and it is rendered probable that a large portion of those interested to know, are yet ignorant of their provisions until informed of them in some public manner. Such laws would seem to come within the reason and spirit of the constitutional prohibition, if not within the letter, and laws affecting whole counties may well be said to be of this class.

Besides this, it may well be urged that the location of each county seat is of interest to the people of the whole state. It is true, the constitution commits the determination of the question to a vote of the people of each county, and properly enough, because they are more directly, as well as more deeply interested than others. But at the county seat of each county, the state, through its proper officers, administers justice. All the inhabitants of the state are liable to be sued in any county, and to have their rights litigated there. And we think there is much force in the reasoning of the late Chief Justice Stowe, in the Washington County Seat Case, 2 Chand., 256, where he contends that laws relating to the location of county seats are public acts. And this view is sustained by other authorities.

In the case of *Pierce vs. Kimball,* 9 Greenleaf, 54, the court

held an act providing for the survey of lumber, and forbidding the purchase and sale of lumber not surveyed in a single county, to be a public act.

In the case of *New Portland vs. New Vineyard*, 4 Shep., 69, it was decided that an act annexing one town to another, was a public act. The court says : " Those are to be regarded as public acts which regulate the general interests of the state, or any of its divisions."

The same court, in the case of *Gorham vs. Springfield*, 8 Shep., 58, held that an act incorporating a town was a public act. By the statutes of Maine public acts were not in force until thirty days after the adjournment of the legislature which passed them. And in both these cases the point was whether the act in question was in force previous to the ex- piration of the thirty days; and the court held it was not. And this is the precise question presented here, for we have no doubt the words " general laws" in our constitution, were intended to include the same class of laws as the words " public acts" in the statutes of Maine.

In the case of *West vs. Blake*, 4 Blackf., 236, the court held that an act authorizing an agent of the state to lay off and sell lots in a particular town, it being the seat of government, was a public act. And in reasoning upon the question, it says : "Statutes incorporating counties, fixing their boundaries, *establishing court-houses*, canals, turnpikes, rail- roads, etc., for public uses, all operate upon local subjects. They are not, however, for that reason, special or private acts." Other authorities might be mentioned of a similar import, showing, in the language of a learned law writer, that " in this country the disposition has been, on the whole, to enlarge the limits of the class of public acts, and to bring within it all enactments of a general character, or which in any way affect the community at large."

But without pursuing the subject farther, whatever doubt

there might otherwise be as to the general character of this law, we think the following consideration places it beyond doubt. As has already appeared, the provisions of chap. 85, Laws of 1857, are incorporated into, and made a part of it. This chapter was itself a general law, and prescribes penalties for illegal voting, and for counselling or advising it, which were clearly applicable to the people of the whole state. By this act people residing outside of the county of Iowa, going there and voting on the county seat question, or counselling others to do so, were made liable to punishment. Indeed, § 5, which makes it an offence to vote in a county where the voter did not reside, was applicable exclusively to those residing out of Iowa county, and could not have been violated at that election by those residing in it. We have no doubt that this makes the law in question a general law, within the prohibition of the constitution.

The case of *Charles Rogers,* 2 Greenf., 303, and the case of *Heridia vs. Ayres,* 12 Pick., 334, fully sustain this view. In the last mentioned case the question arose on a law relating to piloting vessels into Boston harbor. Upon this point the court remarks as follows: " The last objection is, that the statute is a private act, and ought to have been recited in the declaration. Without going minutely into this subject, which sometimes involves distinctions of much nicety and difficulty, there is one consideration which renders it decisive that this is a public act; which is, that the first section in terms imposes a penalty upon every person who shall violate its provisions. It is, therefore, binding upon every citizen of the commonwealth, and upon every stranger, who, coming within its jurisdiction, owes a temporary allegiance to its laws."

Being of the opinion, therefore, that this law, providing for submitting the question of a removal of the county seat to the voters of Iowa county, was a general law, it follows that it could not be in force until published.

State ex rel. Cothren vs. Lean.

The counsel for the respondent urged that the petition does not contain a sufficient allegation that the law was not published. But we think it does. It avers that the act was never published in accordance with the provisions of chap. 6 of the General Laws of 1858, "nor in any other manner known to the law." And we think, in order to give it effect, the publication must be in some manner known to the law. The constitution says that the legislature shall provide for the publication of laws, and that no general law shall be in force until published. We think the publication mentioned in the last clause, is the one required to be provided for in the first; that is, that it must be in pursuance of some law. The motion to quash the alternative writ, is, therefore, denied.

But as we have held the filing of such a motion to be proper practice, to test the sufficiency of the application, we think, when the motion is overruled, the respondent should have further time to answer if he desires it. If further time is desired, the respondent may answer within twenty days, and the peremptory writ is denied. If no further time to answer is desired the peremptory writ may issue.

By the Court, PAINE, J., July 11, 1859. Since the former decision on the several motions then pending, the respondent has filed a return, to which the relator has demurred. On the argument the question was raised whether or not the allegations in the petition, on which the writ was issued, which are not denied by the return, are to be considered as true. The respondent's counsel contended tha they were not; and that the return is the primary pleading in the case, and that on a demurrer to that, nothing was to be taken as true except the allegations of the return itself.

But we do not think this view correct. On the contrary, we are satisfied, both from the reason of the thing, and from

State ex rel. Cothren vs. Lean.

the authorities on the subject, that the affidavit, or petition on which the alternative writ issues, the allegations of which are incorporated into the writ itself, performs the office of a declaration. It sets forth the grounds relied on by the prosecutor, as entitling him to the peremptory writ, and it is incumbent on the respondent, by his return, to sufficiently answer those allegations, and negative the prosecutor's right. The function of the return is not simply to show what would amount to a *prima facie* right in the respondent, in the absence of any allegation to the contrary; but it is to show a right to refuse obedience to the writ, in view of the allegations it contains. And if it does not do this, it is demurrable. And the very object of a demurrer to the return, is to test its sufficiency as an answer to the allegations of the writ; and it is obvious that this can only be done by assuming all the material allegations of the writ not denied, nor confessed and avoided, to be true.

The plea or answer which the plaintiff may put in to the return, is designed to enable him to traverse or confess, and avoid it; when it, in the first instance, sufficiently answers the writ; and not to repeat material allegations previously made, which had been left entirely unanswered, in order to obtain the benefit of them.

We think therefore that the demurrer to the return raises the question of its sufficiency, and of the sufficiency of the relation, and that in disposing of it, not only the return, but every material allegation in the relation not denied nor confessed and avoided, is to be taken as true.

The return sets forth the enactment of the law authorizing the vote on the removal of the county seat, and election under it resulting in favor of Dodgeville, substantially as set forth in the relation, with the addition however that the act was published under the direction and authority of the Secretary of State, in the paper authorized to do the state printing, at the capital, on the twenty-fourth day of September, 1858;

and also in the "Iowa County Advocate," a paper published at the county seat of Iowa county, on the 30th of September, 1858.

The first question presented by the demurrer is, whether this was such a publication as made the law operative. By the laws in force at the time of the enactment of this act, the Secretary of State was required to furnish to the person authorized to do the state printing, within one week after its passage, a copy of every general law, and the latter was required to " immediately publish the same in a newspaper printed at the seat of government." The same person was also required to print all laws, general and special, in bound volumes, and deliver them to the Secretary of State within sixty days after the adjournment of the session at which they were enacted. These and other provisions having any bearing on the question, are found in chap. 5, R. S., 1849 ; chap. 504, Laws of 1852 ; chap. 99, Laws of 1857 ; and chap. 114, Laws of 1858.

It is clear that the publication set forth in the return, was not within the time mentioned in the provisions above referred to. But it was contended by the counsel for the respondent, that these provisions were directory and not mandatory, and that a publication after the time prescribed, would be equally effectual to make the law operative, as one within the time. And to sustain this the cases of *The People vs. Allen*, 6 Wend., 486, and *The People vs. Cook*, 14 Barb., 259, were cited. We are not prepared to deny that the doctrine established by these and other similar cases, is applicable to our statutes providing for the publication of laws. On the contrary, we think it is applicable, and that those statutes may be regarded as directory to a certain extent. But we do not think it follows from this that there is no limit, and that because the precise time mentioned in the laws may be passed, that therefore a publication at any future time would be good,

without reference to the general object of the laws upon the subject, or to the nature of the particular act in question. We think both of these may be considered to establish such a limit.

For we understand the doctrine concerning directory statutes to be this : That where there is no substantial reason why the thing to be done might not as well be done after the time prescribed as before—no presumption that by allowing it to be so done, it may work an injury or wrong—nothing in the act itself, or in other acts relating to the same subject matter, indicating that the legislature did not intend that it should rather be done, after the time prescribed, than not to be done at all ; there the courts assume that the intent was, that if not done within the time prescribed, it might be done afterwards. But, when any of these reasons intervene, there the limit is established. Thus, in this case the statute required the Secretary of State to furnish the printer with a copy of the act within one week after its passage, and the latter to publish it " immediately." This would mean as soon as it could be done in the ordinary course of such business. But if not so published, it might well be done afterwards, and still held effectual; but, clearly not at any indefinite time afterwards. The very nature of the act itself should prevent this. It provided for a vote of the people of Iowa county on a matter important to them. It contained no provision for giving notice of the election. And even the counsel for the respondent would not contend that a publication in a newspaper at the capitol, the day before the one on which the election was to be held, ought to give the act validity.

Certainly it would be impossible to say that the legislature ever intended that this should be authorized, by a provision for its " immediate" publication. Where then is the limit? The majority of the court have come to the conclusion, that in the absence of any thing in the character of a particular

act which would require a stricter compliance with the provisions of law as to time, the following would be a sound rule to adopt: That is, that the printer, in case he fails to comply with the statute, by an "immediate" publication of general laws, in a newspaper at Madison, may still give them effect by such publication at any time prior to the publication and issuing of the bound volumes of the laws, or by publication therein; but not after. We do not say that if these bound volumes are not published within the time prescribed by law, that a law may not be made operative by publication at any time before they are published, but after these volumes are actually issued, we think the power of publication is at an end.

The provisions of the statutes themselves, and the object to be attained by a publication, would seem to indicate this as the utmost extent to which these statutes should be held directory. Because the law itself provides for the publication of these bound volumes, and that they be delivered to the Secretary of State within sixty days after the session, and by him distributed to the counties and officers authorized to receive them. He is required to compare them with the enrolled acts in his office, to specify any errors in the publication, and then append his certificate that the volumes are correct. The provision for the "immediate" publication in the newspaper, evidently contemplates that such publication will take place before the publication in the bound volumes. When therefore the latter have been issued and distributed among the people pursuant to law, they have the right to look to those volumes as containing the laws by which they are to be governed until another session of the legislature. They are thereby legally informed that those are the laws, and that there are no other laws by which their rights may be affected.

And we think that after these volumes are issued, it raises a strong presumption that to allow a general law, requiring

people to act with reference to important interests, and exposing them to new penalties and punishments, to become operative by a subsequent publication in a newspaper at the capitol, would work great injustice.    If such a thing could be allowed, instead of the provisions of law requiring publication, being any protection to the people against those mischiefs which the constitution designed to guard against, they might in many instances serve as a snare, and delude men into a false idea of safety, while their interests were being affected by the operation of statutes which a reasonable diligence had not only not enabled them to discover, but had shown them, by lawful evidence, did not exist.    We think it would be carrying the doctrine of holding statutes directory, to an unwarrantable extent, to sustain such a rule.

And we think the view we have taken as to the intent to be derived from these various provisions, is confirmed by reference to subsequent legislation.    Sec. 31, chap. 6, of the Revised Statutes, now in force, provides that the Secretary of State shall cause the laws of general interest to be published in all the papers of the state ; leaving him a discretion to prescribe within what time such publication shall be completed ; with however a positive proviso that it shall be completed within two months after the adjournment of the session. This being about the exact time provided for the publication of the bound volumes, it shows that this legislation looked to to them when issued, as the sources of information as to the laws, and did not intend to allow subsequent newspaper publications.    And this only corresponds with the intent fairly to be derived from the previous statutes.

It appearing therefore that this act was not published until after the publication of the bound volumes of 1858, and was not contained in them, we are compelled to say that we cannot hold the statutes on the subject directory to the extent of warranting such a publication.

State ex rel. Cothren vs. Lean.

Having come to this conclusion it is unnecessary to pass upon the other questions discussed. The demurrer must be sustained, and the peremptory writ issue.

COLE, J.—*Dissenting*—on the 5th of September, 1860, filed the following opinion :

Although I concurred in the former decision of this court, in which we held that the act providing for the removal of the county seat of Iowa county, chap. 184, Ses. Laws, 1858, Private Acts, was a general law within the meaning of § 21, Article VII. of the constitution, yet since that decision was rendered, I have entertained grave doubts as to its correctness; and as to whether the constitutional provision was not *intended only to* apply to such laws as should extend territorially over the whole state, and affect generally all its citizens. I can well understand how a distinction may exist between a public local law, and a general statute. The former being local or limited in its operation, nevertheless is treated as a public act, because, although limited to a particular locality, yet affecting the public at large, when acting within that locality, in reference to the matter within the purview of the act; while a general statute is intended to operate upon and have a binding force over all the citizens generally. The citizens of the state, undoubtedly, in a certain sense, may be said to have an interest in the question as to where the county seat of a county is to be located, because it is at that place that the county offices are to be situated, and the public records kept, and justice administered ; and so, too, they may have an interest in every tax voted at a school district meeting, for the building of a school-house, or to raise money to defray the expenses of sustaining a school in such district, though, perhaps, to a greater degree in the former case than in the latter. Now it is very clear

that the act providing for the removal of the county seat of Iowa county, is a public act, but can it be said to affect the the citizens at large like the statute for the assessment and collection of taxes, or the general election law, or the criminal code of the state? The latter are general laws in the proper and strict sense of that term, and I think it was to such laws that the constitutional provision was intended to apply. So as I stated in the opinion which I filed in the case of *Clark vs. The City of Janesville*, [not published,] I think a distinction may well be taken between a public local and a general law, and that it was the latter class of statutes which the framers of the constitution had in view when they used the language; " and no general law shall be in force until published."

But not to dwell longer upon this point, and assuming, for the purpose of disposing of the demurrer interposed to the return in this case, that the act for the removal of the county seat of Iowa county, was a " general law," within the proper constitutional sense of that term, and we are next to inquire whether it was not published so as to be in force at the time of the election held under it in November, 1858. The legislature provided, by the fifth section of the act, that the same should take effect and be in force *from and after its passage ;* and the respondent, in the return, alleges the facts in regard to its publication to be as follows: " That the said act was after its passage duly delivered by the Secretary of State to the persons authorized to print the laws, and the said act was, by said printers, on the 24th day of September, 1858, duly published in the *Argus and Democrat*, a newspaper printed and published at Madison, the seat of government of said State of Wisconsin, that being the paper published by the persons authorized to publish the laws, and the paper in which the laws were at that time authorized to be published ; and said act was by authority then and there published there-

in.   And it is further averred, that the Secretary of State
caused said act to be duly published in the "Iowa County Ad-
vocate," a weekly newspaper, printed and published at Dodge-
ville, in the county of Iowa, on the 30th day of September,
1858, and the same was on that day duly published in said
newspaper, and which paper was duly authorized to publish
and print the laws and acts of the legislature of that year, of
a public or general nature."   The demurrer admits these alle-
gations in regard to the publication of the law to be true, and
the question arises, do they not show a sufficient publication
of the law to render it operative?

It is to be borne in mind that the legislature declared in
the act itself, that it should take effect and be in force from
and after its passage.   Still, according to the conditions of the
question, the law could not go into operation until published
in compliance with the provisions of the constitution.   The
constitution contains no specific directions in regard to the
publication of the statutes, neither does it declare what shall
be considered a sufficient publication.   It enjoins upon the
legislature the duty of providing " by law for the speedy pub-
lication of all statute laws, and of such judicial decisions
made within the state as may be deemed expedient;" but
the time, or at all events the manner of such publication, is
certainly within the control of the legislature.   It will be con-
ceded that the publication should be in some authorized
manner, and should comply, as nearly as practicable, with
the requirements of the statute in regard to the publication of
the laws of the state.

By § 1, chap. 5, R. S., 1849, it was provided that "the Sec-
cretary of State, immediately after any general law of the leg-
islature shall have been deposited with him, shall furnish a
copy thereof to the person authorized to print the laws, who
shall immediately publish the same in a newspaper printed
at the seat of government."   It is further provided, in subse-

State ex rel. Cothren vs. Lean.

quent sections of the same chapter, and the various acts amendatory thereof (chap. 504, S. Laws, 1852; chap. 99, S. Laws, 1857, General Laws; chap. 114, S. Laws, 1858, General Laws), that the laws, resolutions, and memorials of each session of the legislature, should be printed and bound in a certain manner, by the person authorized to print and bind the same, and should be delivered to the Secretary of State within sixty days after the adjournment of the session of the legislature at which they were enacted, to be distributed to to the various officers of the state, and also to be distributed to certain officers and libraries of the state, United States, and of our sister states. This, in substance, is all the legislature has enacted in reference to the publication and distribution of the laws of the state. It has authorized a publication of the statutes in a newspaper printed at the seat of government by the person authorized to print the laws, and also required that a certain number of volumes of the laws shall be printed and bound in a prescribed manner, by the same person, for distribution as stated above.

Now, does the return show that the law providing for the removal of the county seat of Iowa county, was published in substantial compliance with these statutes? It seems to me it does. It sets forth that the law was delivered by the Secretary of State to the persons authorized to print the laws, who published the same on the 24th day of September, 1858, in a newspaper published at Madison. It likewise states that the Secretary of State caused the law to be published in a local newspaper published in Iowa county. And although I have not found any provision of law requiring the Secretary of State to cause that act to published in a newspaper in Iowa county, still it is most obvious that no means were so well calculated to bring that law within the observation and knowledge of the people most directly affected by it as a publication in the local papers of that county. Neither could

any publication of that law have been made more in accord-ance with the spirit of the constitution.

For why did the constitution declare that no general law should be in force until published? What mischief was to be guarded against, what good was to be secured by such a provision? Was it not because it was deemed necessary to the security of public and private rights, to the liberty of the citizen and safety of the community, that the laws, as far as possible, should be brought home to the knowledge and understanding of the people subject to them? If the laws were not published, how could the people gain a knowledge of their provisions? And in this age of newspapers, what method so well calculated to bring the laws within the knowl-edge and under the observation of all, as to publish them in the newspapers? And this, evidently, was the medium relied upon by the legislature to give general publicity to the statutes. Hence, it is provided that all general laws shall be published in a newspaper printed at Madison by the persons authorized to print the laws. So the publication of this law was made in a way or manner known to the law. It was an authorized publication, and as the legislature had provided that the law should be in force from and after its passage, as soon as it was published it went into operation.

But in this connection it may be proper to allude to one or two circumstances in regard to the publication of this law, which were much relied upon by counsel in the argument, and which the majority of the court seem to think, exert a controlling effect upon the question, as to the sufficiency of that publication, but which, according to my view, do not es-sentially vary the question. The statute requires " the Sec-retary of State, *immediately* after any general law shall be deposited with him, to furnish a copy thereof to the person authorized to print the laws, who shall *immediately* publish the same in a newspaper," &c. Now, one objection taken to

the publication of this law in the newspaper in September, was that such publication was not in compliance with the statute as to the time it should have been published. It is true the statute requires by its language that all general laws should be immediately published; whereas this law was not in fact correctly published in the proper newspaper until some five months after it was approved by the Governor. It was however published about forty days before the election in November, when the electors of Iowa county were to vote upon the question of the removal of the county seat, and in time to give the people of that county full and ample opportunity to become acquainted with its provisions. Why then was not the publication of the law in the proper newspaper in September sufficient?

No one will contend that the language of the statute requiring *immediate* publication is to have a strict literal construction. it would be simply absurd to suppose the legislature intended that all general laws should be published in a newspaper *immediately* after copies thereof were handed to the printer. The thing would be a physical impossibility. What then did the legislature intend by requiring that the laws should be *immediately* published in a newspaper? Evidently that they should be published as soon as practicable; as soon as the business of the office would permit. And a law like the one under consideration should be published a reasonable time before the election to enable the citizens who are called upon to act under it to become acquainted with its provisions so as to act intelligently and understandingly. This I apprehend is all that is necessary, and all the legislature intended by requiring an *immediate* publication of a general law.

The statutes in regard to the publication and distribution of the laws are mainly directory in their provisions. They are intended to guide the state officers and the state printer in regard

to the publication of the laws. A strict literal compliance with the language of those statutes never was expected, and in fact, never was had in the publication of any law of this state. And to hold that it is essential to the validity of an act of the legislature that the statutes in regard to its publication should be strictly complied with, is a proposition to which I cannot yield my assent.

But there is another circumstance which it is insisted has an important bearing upon this question as to the publication of this law, which I have not noticed, and it is this: The bill as originally introduced for taking a vote of the electors of Iowa county upon the subject of the removal of the county seat, provided for an election in April, 1858. The law as finally passed provided for a vote to be taken at the general election in November of that year. By some mistake the state printer published in the newspaper the bill as originally introduced providing for an election in April. The same mistake occurred in publishing the bound volumes of the laws of that session. When the mistake was discovered the law was correctly published by the state printer in the newspaper printed at Madison, and it was also published by direction of the Secretary of State, in a local paper in Iowa county. But nevertheless the relator avers in the relation, and it is insisted upon the argument that the act was never published or printed in accordance with the provisions of law upon that subject, nor in any manner known to the law. Or as I understand the doctrine contended for, it is in substance this: If an act of the legislature, through inadvertence or mistake of the state printer or Secretary of State, happens not to be printed in the bound volumes of the statutes, or happens to be incorrectly printed therein, before it is correctly published in the newspaper authorized to publish the laws, no publication thereafter made will cure the mistake, however general such publication may be, but the legislative will is defeated,

and the act can have no validity whatever, since no constitutional publication thereof can ever be made.

If this is so there is a limitation upon the legislative power of this state not fully understood and appreciated by the people at large. If the state printer, or an employee of that functionary, by carelessness, or design, can defeat an act of the legislature, by omitting to incorporate it in the bound volume of the laws, or by incorrectly printing it therein, before he correctly publishes it in his newspaper; then it appears to me the state printer has a more absolute veto or check upon the legislative power of the state than has heretofore been supposed to belong to any person, or reside anywhere, in our system of popular government. And what is the more incomprehensible to my mind is the doctrine laid down upon this subject, which is, that if a law happens to be correctly published by the state printer in the newspaper authorized to print the laws, it will go into operation and be in force whether it is afterward published in the bound volumes or not; but if it is not published in such newspaper before the bound volumes are published in which such law is omitted, or is incorrectly published, no good and sufficient publication can thereafter be made in the newspaper published by the state printer. After the bound volumes are actually issued, then it is said the power to make a good publication through the newspaper authorized to publish the laws, ends and ceases forever. It seems to me that this position is wholly untenable, and that such a construction of the statutes and of the constitution is unwarrantable.

As already remarked, the constitution contains no directions in regard to the manner general laws shall be published. It declares no general law shall be in force until published; but the manner, mode and way of publication are entirely within the control of the legislature. It is very clear that the legislature supposed that the best medium of communication

with the public and the most certain method of bringing the laws within the reach and knowledge of the people, was the newspaper press, and hence it was provided that the laws should be published in a newspaper printed at the seat of government by the person authorized to publish them. For the sake of convenience and for the purpose of having the laws in a permanent form, a certain number of volumes of the laws are also printed for distribution among the various officers of the state. And while I have no doubt but that a publication of the laws in these bound volumes, would be a sufficient publication to meet the requirements of the constitution, without any other publication whatever, yet when the object of the constitutional provision is regarded, namely, to make known to the people the laws by which their rights and interests are affected, to secure that result, no publication would be so effectual and so adequate as a publication in a newspaper. Thousands see and read legislative enactments in the papers who would never meet with them in the bound volumes, limited in numbers as those volumes are. And I fail to comprehend why a good publication of a law cannot be made in the proper newspaper as well after as before the bound volumes are issued.

It is desirable to be sure that the laws should all be accurately published in the bound volumes. But if they are not so published, what is to be the consequence? These volumes may be published before the state printer can possibly publish the laws in his newspaper. Suppose these volumes are published first; is a stupid blunder of a printer, a typographical error in publishing these volumes, to defeat an act of the legislature? Cannot a good publication of the law afterwards be made in the proper newspaper so that the law may take effect under the constitution? It is very clear to my mind that it can be so published; and I think a good publication was made in this case.

State ex rel. Cothren vs. Lean.

The law was published at the seat of government in the newspaper authorized to publish the laws; that publication was made some forty days before the election at which the vote was to be taken upon the question of the removal of the county seat. A vote was taken, and I am bound to say, that I discover nothing in this record which shows that the will of the electors of Iowa county was not fully and fairly expressed upon that issue. A decided majority of the electors was in favor of the removal of the county seat to Dodgeville, where the respondent keeps his office of register of deeds; and I see no reason why the popular will in that behalf expressed, should not have effect and be carried out. I cannot think that any one was misled by the stupid blunder made in publishing the law in the bound volumes. As then published it appeared that the law was approved by the Governor on the 28th of April, some time after the town elections. A mistake so obvious and palpable was not calculated to and probably did not deceive any one, particularly after the pains taken to correct this blunder, by having the law correctly published in the manner stated in the return.

I think the demurrer should be overruled.