COLEMAN ET AL. v. THE PEOPLE EX REL. DONELSON.

1. COUNTY SEATS, HOW REMOVED.
Under the constitution the general assembly has no power to remove
    a county seat.
The constitution deprives the general assembly of power to remove a
    county seat, but permits the question of such removal to be reg-
    ulated by general law, with these limitations: That there can be no
    removal unless a majority of the electors vote for it, and that no
    proposition on the subject shall be submitted oftener than once in
    four years.
2. ELECTIONS—COUNTY SEAT—DESIGNATION OF LOCATION.
Where, in an election for the permanent location of a county seat, voters
    designate on their ballots different places which are substantially
    in the same locality, the ballots should be counted for the general
    spot covered by the descriptions.
3. MANDAMUS TO REMOVE COUNTY SEAT—LACHES.
Where the relator, in mandamus proceedings to compel the removal of
    a county seat, has long been a resident of the county, without tak-
    ing steps to test the legality of its location, he should not be per-
    mitted to initiate such proceedings.
4. ELECTIONS—STATUTORY CONSTRUCTION.
The statute having provided that upon the organization of a county the
    voters thereof may select the place for the county seat by a vote at
    the first election held for the choice of county officers, that if no
    place has a majority of the votes cast the county commissioners
    shall within one month thereafter call a special election upon the
    question, and if no place then has a majority, a vote may be again
    taken at the next general election, and the commissioners having
    concluded that a first election for the location of the county seat
    resulted in no choice, the question was again submitted at the next
    general election, without having first called a special election.  *Held,*
    that the omission to hold a special election did not deprive the
    voters of the right to express their wishes at the general election.

*Error to the District Court of Routt County.*

Messrs. ROGERS & SHAFROTH, for plaintiff in error.

Mr. GEO. L. HODGES, for defendant in error.

BISSELL, J., delivered the opinion of the court.

For nearly seventeen years Hahn's Peak has been the county seat of Routt county. In March, 1894, Ephus Donelson, an alleged taxpayer of the county, commenced these mandamus proceedings to compel the removal of the county offices and records to Hayden, which he alleged was in law, if not in fact, the county seat of Routt county. In determining this controversy, we shall depart a little from the almost universal practice which prevails in this and other appellate tribunals. The situation warrants the deviation. On the conclusion of the trial, the court made certain findings of fact, and expressed his conclusions of law. We shall not accept these findings of fact as conclusive on this court, nor as disposing of one of the propositions which we expect to discuss. The justification for this departure is found in the method of trial. The case comes here in precisely the same shape that it would had the cause been tried or heard on depositions, under which circumstance, it is the well settled rule in this jurisdiction, the appellate court has the right to weigh and sift the evidence and for itself determine what it shows and the conclusions which may be legitimately drawn from it. The case was tried on a stipulation which embraced most of the facts, and on the testimony of four witnesses, who were called for the respondent, and whose testimony is uncontradicted. This situation is ample warrant for our position.

Routt county was created out of the county of Grand, by an act of the legislature approved the 29th of January, 1877. By the terms of the act the governor was authorized to appoint the county commissioners and the other requisite county officers to organize the county government and set it in operation. According to the act, the court and county offices should be located at such place in the county as should be

designated by the commissioners, until the next general election after the passage of the act, when the electors of the county were authorized to permanently locate the county seat.   The facts which we shall now state, would, under certain conditions, furnish a conclusive reason for the reversal of this jugdment.   The decision will not be placed on this precise ground, yet the matter received so much attention at the hands of the trial court and the record contains so much evidence respecting the matter that we feel quite at liberty to express our convictions concerning it.   When Routt county was established, that part of the state was a very much unsettled country.   To-day, it is probably the most remote from the systems of transportation, and Hahn's Peak is the most inaccessible county seat in the state.   When the matters happened of which we shall speak, that section contained nothing but a few thinly peopled mining camps in the vicinity of the landmark of that county, Hahn's Peak mountain.   This mountain is visible for miles, and in the early days was always referred to as the place whence the miner was journeying, if he was going to Routt county, as Pike's Peak was known all over this country and spoken of as the objective point of the west bound traveler.   At the base of this mountain there had been some discoveries of placer mines, which were being worked by various mining companies and prospectors.   In a space of probably less than three miles at the foot of the mountain, there were several places where mining operations were being prosecuted, and as the miners gathered together in little sections they gave to the particular locality where they were working divers names of the sort which miners frequently adopt.   They were spoken of as Hahn's Peak, Poverty Flat, Bugtown, and International Camp; the last two names being interchangeably used to designate one and the same place.   There was a post office at this point which by the department was called Hahn's Peak.   One of the witnesses testified he was living at Bugtown or International Camp at the time of the election in 1877, and remained postmaster for some little time thereafter.   At this time the post

office was at Bugtown or International Camp, although it was called Hahn's Peak post office. The post office was subsequently moved, though at what exact time is not stated, to the spot where the county records and courthouse now are, which is now known and probably was then called Hahn's Peak. These places are between one and one half and three miles apart, and right around the base of the mountain; Poverty Flat being a somewhat broad plain or tongue of land which divides them. These facts must be borne in mind, and their applicability will be appreciated when we come to discuss the vote which was probably cast in 1877 for a county seat. The county commissioners, under the legislative authority, placed the county offices at Hayden, which is the point to which the relator now seeks to remove them. They were kept in this locality until the spring of 1879.

As has already been stated, the act of 1877 authorized the voters to permanently locate the county seat of the county at the next general election following the organization of the county. The record is not entirely satisfactory with reference to what happened in 1877. The respondent did not rely on the election of 1877 for its defense, but justified under what was done in the general election in 1878, following which the county seat was removed to its present situs. The evidence respecting the election of 1877 is of course exceedingly meager. It was had nearly twenty years ago, and in a thinly settled locality, where few of the forms and uses which prevail at the present time were observed. The records seem to have been lost, and all that could be produced were the poll books used at the election. These poll books showed that, at the election of 1877, 96 votes were cast on the question of locating the county seat. Windsor got 35 votes; Steamboat Springs, 2; Hahn's Peak, 12; International Camp, 47. Notwithstanding this fact, the commissioners appear to have concluded there was no choice by the voters, for the question was again submitted to a vote at the ensuing general election.

It now becomes necessary to state the general legislation

respecting the location of county seats. The organic law in section 2, article 14, of the constitution, deprives the general assembly of the power to remove the county seat of any county, but permits the question to be regulated by the general law with these limitations : There can be no removal of the county seat unless a majority of the electors vote for it, and no proposition on the subject shall be submitted oftener than once in four years.

The Revised Statutes of 1868 contained certain provisions. These statutes are referred to in place of the compilation of 1877, because part of the act found in the revision was omitted in the compilation of 1877, and is only found under the head of "Errata," at the beginning of that volume. Those acts are :

" SEC. 40. It is further provided that the people may locate permanently the county seat in any part of the county, by a vote of the majority of the legal voters in each county, according to law.

" SEC. 41. Whenever any county shall be organized hereafter, the qualified voters thereof are hereby empowered to select the place of their county seat by a vote at the first election held in the county for the choice of county officers. For that purpose each voter may designate on his ballot the place of his choice for the county seat; and when the votes are canvassed the place having a majority of all the votes polled shall be the county seat; and public notice of said location shall be given within thirty days by the county commissioners, by posting up notices in three public places in the county.

" SEC. 42. Whenever the legal voters of any county are desirous of changing their county seat, at any time, upon petition being presented to the county commissioners, signed by a majority of them, to be ascertained by said commissioners, it shall be the duty of such commissioners to require the sheriff, in giving the notice for the next county election, to notify said voters to designate upon their ballots, at said election, the place of their choice ; and if, upon canvassing the

votes polled or given, it shall appear that any one place has
a majority of all the votes polled, such place shall be the
county seat, and notice of such change shall be given, as pro-
vided in section forty-one.

" SEC. 43. If no place has a majority of all the votes polled
in either of such elections for the location or change of the
county seat, it shall be the duty of the county commissioners,
within one month after any such election, to order a special
election and give ten days' notice thereof, in each township
in the county, at which election votes shall be taken by bal-
lot, the same as at the general election, and if no place then
have a majority of all the votes, the county seat shall not be
changed until the next general election, when a vote may
again be taken, as provided in section forty-one." Revised
Statutes of 1868, chap. 20.

Under this legislation, the question of the permanent loca-
tion of the county seat was undoubtedly remitted to the vot-
ers of the county. Of course, this suggests the question
whether what was done by them at the election in 1877
legally resulted in the permanent location of the county seat
at Hahn's Peak. We are inclined to suggest our opinion
concerning it, because if it was necessary to so hold in order
to arrive at the result, which we have concluded is right, we
should hold on the proof that the election of 1877 settled
the question, and what was done afterwards did not operate
to defeat the wish of the people as then expressed, and could
be wholly disregarded in the settlement of the question, for
it simply amounted to a confirmation of the antecedent acts.
The difficulty is this issue was not formed by the allegations
of the petition and the averments of the return. The re-
spondents did not rely on it, and may have failed to produce
all the testimony on this subject which was available. It
tends, however, so strongly to support us in our subsequent
conclusions, and to maintain the proposition on which in
reality we rest our position, we deem it wise to give our views
concerning it. The chief difficulty springs from the loss of
the records. The poll books of 1877 were produced and

offered in evidence, and these clearly showed an election in
1877 at which the voters of that county expressed their opin-
ion on the question of permanently locating the county seat
of Routt county.    These books likewise showed that 96 votes
were cast, and in the proportions and for the places which
have been named.    If those poll books alone were sufficient
evidence to establish all the facts requisite to the conclusion
that a legal election had been held, they would furnish an
abundant basis to support the conclusion of a valid election
in 1877 and a permanent location of the county seat.    The
county was created in January, 1877.    The next general
election was in the fall of that year.    The voters cast their
ballots in view of that fact for the various places as named.
This leaves the sole inquiry whether, when the voter cast
his ballot for International Camp, he intended to vote for
Hahn's Peak, as did the voter who put that name or desig-
nation on his ballot.    We must so conclude.    In questions
of this description, no particular geographical spot need be
voted for to place the seat of government in one locality.
Sufficient definiteness to enable the court to decide what the
purpose and what the intention of the voters were is enough.
A most excellent illustration of this doctrine is found in an
early case in our own supreme court, where it was decided
that votes cast for Grand Lake and votes cast for Grand
Lake West Side should be counted as having been cast for the
same place, and that any spot on Grand Lake could be se-
lected by the commissioners as the point for the erection of
the county offices, and the location of the records.    The same
theory has been expressed in other states, where there has
been a controversy arising from the designation of the voters
on their ballot of different places which were substantially in
the same locality.    These have always been held properly
counted for the general spot covered by the descriptions.
*People ex rel. v. Commissioners*, 7 Colo. 190 ; *State of Iowa v.
Cavers et al.*, 22 Iowa, 343 ; *State of Nebraska ex rel. v. Dins-
more*, 5 Neb. 145 ; *Fall River County v. Powell et al.*, 58
N. W. Rep. 7 ; *Attorney General v. Canvassers*, 64 Mich.
607.

We should therefore conclude that in 1877 Hahn's Peak had been chosen by the voters as the permanent location of their county seat, and that the votes which were cast for Hahn's Peak and International Camp were cast for the same place and should have been counted by the board, and that they had the authority under the acts then in force to locate the county seat at that spot. The trouble, however, is the election was not fully or satisfactorily proven, nor was there evidence to show that the board declared the result and established the county seat in accordance with the legislative authority. Under these circumstances, we must conclude there was so far a failure in 1877 to permanently locate the seat as to leave the question open for the consideration and action of the voters at the next general election. What we might be compelled to hold if the proof and the record were otherwise, it is wholly unnecessary to declare. We are not compelled to determine whether the constitutional limitation of four years would operate to invalidate the election of 1878, because although we are fully convinced the votes for Hahn's Peak and International Camp were cast for one and the same place, and under proper conditions and circumstances would have legally resulted in the establishment of the county seat at that place, yet the failure of the proof in this regard and the neglect of the commissioners to comply with the requirements of the act leaves the record in such shape that we are permitted to conclude there was no legal election held in 1877 which exhausted the authority of the people. The matter was therefore open for subsequent procedure under the statute. This whole discussion, however, has been used as an introduction to the main question, to show how completely we are justified in our conclusion because of the expressed will of the voters on the subject.

We are now relegated to the principal inquiry, whether the election of 1878 located the county seat at Hahn's Peak. Almost the only difference between counsel on this subject springs from the different views which they take respecting

the acts of 1868.  It will be recollected several different conditions were provided for.  The .voters were given the absolute right to locate the county seat.  This was the general authority granted.  The act undertook to provide means and methods for the expression of the will of the voters and the execution of this authority.  When a county should be organized, the county commissioners were given the right to choose the spot where the seat of government should be first established.  At the first general election next ensuing, the matter should be submitted to the legal voters of the county, whose votes should settle the question.  It might, however, happen a majority of votes would not be cast for any one given place.  To provide for this contingency, it was further enacted that within thirty days the county commissioners should call a special election, at which the question should be again passed on by the voters.  If this special election yielded no result, the matter should be submitted at the next .general election thereafter, and continue to be submitted at general elections until the question should finally be settled by a vote of the people.  The whole thing hinges on the inquiry whether the direction of the legislature to the board to call a special election is a limitation on the right to submit the inquiry to the people at a general election following.  In other words, if the special election is not called, may the voters afterwards be heard on the subject, or are they forever concluded by the failure of the board to act?

There is a preliminary suggestion which we desire to make in the premises.  We do not believe the present relator has any right whatever to institute or maintain these proceedings. He is not in a condition to raise the question.  We concede the statute of limitation does not run against the people, and the proceedings are theoretically in the name of the people, on the relation of the taxpayer who complains and says he is hurt.  We gravely question whether this should take the case out of the operation of the general statutes on this subject.  Mandamus has never been regarded as a writ issuing strictly as a matter of right in favor of a person injured, but

the discretion of the court may always be exercised in determining the question whether it should go in favor of the relator. There are well considered cases which seem to hold a taxpayer estopped from commencing such proceedings when more than the ordinary period of the statute has been permitted to go by without action. Some of the cases proceed on the basis of the adoption by analogy in courts of equity of the common law statutes of limitation. Others again seem to regard the facts as sufficient to operate by way of estoppel to bar the relator's rights. *People ex rel. v. Seneca Common Pleas*, 2 Wend. 265; *State of Nebraska ex rel. v. Piper*, 17 Neb. 614; *Territory ex rel. v. Potts*, 3 Mont. 364; *C. & N. W. Ry. Co. v. The People*, 91 Ill. 251.

The relevancy of this suggestion is quite apparent when we recall the exact situation. The county seat was originally located at Hayden. In the spring of 1879 it was removed to Hahn's Peak, and has been permitted to remain there for nearly seventeen years. Nobody has complained, nobody has objected to the location, and the relator has been a citizen of the county for ten years, and during all that time has taken no steps to test the legality of the location. While we must concede, under the general current of authority as stated in *U. P. R. R. Co. v. Hall*, 91 U. S. 343, a taxpayer has a right to sue where only public rights and public interests are technically concerned, and his interest is only the collateral interest of a taxpayer, we do think he is bound to proceed with reasonable diligence. He cannot sit idly by and let a county seat remain, rights and interests be acquired and determined for ten years, and then be heard to complain. Estates have been settled, judgments have been rendered, titles have been acquired, and all the diversified interests of modern society have been initiated, protected, transferred and carried on, on the faith of the permanent location of the seat of government of Routt county. Plainly, a rule which would debar a taxpayer from initiating such proceedings after an elapse of ten years is right and salutary, whether it be founded on precedent or rests for its declaration on the

evident good sense of the doctrine. This position is very much strengthened by the attempt on the part of the people on two different occasions, in 1883 and 1887, to change the location of the county seat. The matter was submitted to the voters of the county, and the applicants for a change were on both occasions without sufficient votes to remove it. This very strongly tends to support us in the conviction that the majority of the voters of the county prefer to have the county seat retained at its present place, rather than have it removed to Hayden, where it must go if the relator's contention is upheld. It does not accord with our notions of what is right and just to uphold proceedings initiated by one taxpayer and supported evidently by only a minority of the voters of the county.

As preliminary to the discussion respecting the failure of the board to hold a special election, it is well to remember that the power to permanently locate a county seat is lodged nowhere but with the voters of the county. This is the whole tenor of the legislation on the subject, and the principle has been fully recognized and declared by our supreme court *In re Allison*, 13 Colo. 525. The learned Chief Justice Helm, in expressing the opinion of the court, states substantially what must be evident to those who even casually read the statutes. The whole subject is remitted to the control of the voters, subject only to the limitation that the question may not be considered oftener than once in four years. Aside from this limitation, the legal voters of the county have perfect control over the subject, and may, by pursuing the statutory provisions, locate, remove, or change the seat of government, whenever in their judgment any change should be made. The purpose in submitting the question at the election of 1878 was to ascertain the wish of the voters.

The provisions of the law of 1868 were enacted to give the legal voters of any such governmental subdivision of the state an opportunity to express their desires respecting the matter. They might express this wish at the first general election after the county was created. If on that occasion the voters were not sufficiently agreed in their wishes, the

matter should be again submitted at a special election, at which another opportunity should be given them to again vote their convictions. Failing in their object at this special election, the matter must be submitted at each general election thereafter until it was finally determined. The special election in this case was omitted, and we must determine whether that omission deprived the voters of the right in 1878 to express their wish on the subject. We do not so conclude. The statute does not provide that a failure shall bar the right to vote on the subject at the next ensuing general election. Had the legislature intended the special election to be a condition precedent, they would have undoubtedly provided in the act the ways and means for calling it, even after the thirty days had expired, or for holding one when, through any design of the governing body of the county, no such opportunity had been given. It has often been held that where there was a failure to hold a special election at the date and at the place and under the conditions pointed out by the statute, one subsequently held would necessarily be invalid, and resort must be had to other provisions of the legislation to remedy the difficulty. We must conclude this was in the minds of the legislature, and had it been their intention to limit the right of the voters to express their wish at an ensuing general election, some provision would have been made for such a contingency. It is no essential part of the scheme, otherwise than to provide a way in which the voters may express their opinion, and can in no manner be held operative to restrict the subsequent right. The object of an election on this subject is simply to obtain an expression of the public's wish. Free, fair, and full expression of that wish is all the legislature intended to provide for, and when once it is ascertained, effect should be given to it by the permanent location of the seat of government. *Fowler v. The State*, 68 Tex. 30; *Gossard et al. v. Vaught et al.*, 10 Kan. 162; *Dishon v. Smith*, 10 Iowa, 212; *State ex rel. Cothren v. Lean*, 9 Wis. 279.

Regard being had to the special purpose and objects of the legislation, and the absence of any limitation or condi-

tion which makes the special election a condition precedent, we must conclude that a failure to hold it does not vitiate what was done at the election of 1878, and that the wish of the people at that time expressed established the county seat at Hahn's Peak. If we should hold otherwise, it would leave the board of county commissioners complete power to defeat the wish of the people. If the board, for pecuniary or other reasons, desired the county seat to remain where they had temporarily located it, a simple neglect to call a special election would accomplish their object. Of course, this depends on the result of the first general election. If the county seat be not then permanently established, to concede the appellee's contention would be to vest the power of location absolutely in the board. No special election being called, the matter could never be considered at a general election thereafter. No succeeding board could submit the question, and there is no known way by which the voters could enforce their will. The county seat not having been permanently located, there could be no vote as to a change, either in one or four years, and an inefficient, incompetent or corrupt county government would thus be left in full control of the question. No such result should be permitted, and as this is possible, we have a right to infer a want of intention on the part of the legislature to bring it about. When the acts do not of necessity require this construction, that should be adopted which will best and most perfectly tend to carry out the evident purpose of the law-making body.

Under these circumstances, we hold the county seat of Routt county was by the vote of the people legally and permanently located at Hahn's Peak, and until the people shall by a vote on the subject, had under constitutional and legislative restrictions, change the place, it must there remain. The judgment of the district court in these proceedings does not accord with our conclusions, and it must therefore be reversed and judgment final will be entered in this court dismissing the petition.

*Reversed and judgment ordered.*